# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. CR413-172 |
| | ) | |
| GENE H. VANDIVER | ) | |

## REPORT AND RECOMMENDATION

In this cross-burning prosecution, defendant Gene H. Vandiver moves under the Fifth Amendment to suppress the non-custodial statements that he made to law enforcement officers. Doc. 20. An investigating officer, he claims, improperly induced him to confess by falsely promising him only state misdemeanor exposure, when in fact he now faces federal felony charges, including one carrying a ten-year mandatory minimum sentence. Docs. 20 & 46; doc. 2 (penalty certification). The government insists that no improper inducement occurred. Doc. 42. The Court conducted an evidentiary hearing and permitted post-hearing briefs. Docs. 34 & 37; *see also* docs. 42 & 46 (the briefs).

## I. GOVERNING STANDARDS

The Constitution prohibits the police from extracting a confession from a suspect through the use of interrogation techniques "'offensive to a civilized system of justice.'" *Colorado v. Connelly*, 479 U.S. 157, 163 (1986) (quoting *Miller v. Fenton*, 474 U.S. 104, 109 (1985)). Some form of police coercion is "a necessary predicate to [a] finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." 479 U.S. at 167.[1] However, it is not merely physical brutality or the credible threat of such violence that offends the Constitution, but also any coercive interrogation technique that, under an objective assessment of the totality of the circumstances, is sufficient to overbear the suspect's will and critically impair his capacity for self-determination. *Connelly*, 479 U.S. at 163 n. 1 (citing prior cases of police misconduct in securing a confession, many involving the use of

---

[1] While Vandiver references only the Fifth Amendment in his motion to suppress, doc. 20 at 1, and while its protection "against compulsory self-incrimination applies to the States," *Connelly*, 479 U.S. at 163, the Supreme Court's condemnation of coercive police conduct in securing a confession initially rested upon the Fourteenth Amendment Due Process Clause, and the Supreme Court continues to focus upon that constitutional provision when evaluating claims that a suspect's statements were involuntary because of police overreaching. *Id.*

2

psychological pressure); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961); *United States v. Lall*, 607 F.3d 1277, 1286 (11th Cir. 2010); 2 Wayne R. LaFave, et al., Criminal Procedure § 6.2(c) (3d ed. 2013).

As the lower courts have consistently held, a confession is involuntary if made in response to a false promise the confession will not be used against the suspect. *Lall*, 607 F.3d at 1286-87 (police officer's promise that nothing defendant said would be used against him rendered his confession involuntary and inadmissible in a later federal prosecution). It is also constitutionally objectionable for an officer to assure a suspect that he will not be prosecuted or will face a lesser charge and punishment if he cooperates with the police. 2 LaFave, Criminal Procedure § 6.2(c) at 623-625 ("courts have often held that a confession is involuntary if made in response to a promise that the result will be non-prosecution, the dropping of some charges, . . . or a certain reduction in the punishment defendant may receive"). Suppression of a confession secured through a false promise of non-prosecution or leniency is required because

"the government has made it impossible for the defendant to make a *rational* choice as to whether to confess -- has made it in other words impossible to weigh the pros and cons of confessing and go with the balance as it appears at the time." . . . Thus, "if the government feeds the defendant false information that seriously distorts his choice . . . then the confession must go out."

*Lall*, 607 F.3d at 1286 (quoting *United States v. Rutledge*, 900 F.2d 1127, 1129 (7th Cir. 1990) (*Posner*, J.)).

It is important, however, to distinguish such a will-overbearing promise "from a mere *prediction*" that a suspect might receive leniency or favorable treatment if he cooperates. 2 LaFave, Criminal Procedure § 6.2(c) at 624 n. 100 (emphasis added). Inducing such a hope in the mind of the suspect is "not objectionable," at least where the officer does not convey that the hoped-for benefit is within his power to grant or withhold (rather than being a future determination that is beyond his control). *Id.* "Statements 'suggesting leniency are only objectionable if they establish an express quid pro quo bargain for the confession.'" *Id.* at n. 101.[2]

---

[2] Of course, it is not an illegal inducement for an officer merely to promise to bring the suspect's cooperation to the attention of the prosecutor or the court, assure the suspect that all cooperation is generally helpful and encourage him to tell the truth, or inform him of the "realistic penalties for cooperation and non-cooperation." *United States v. Jones*, 32 F.3d 1512, 1517 (11th Cir. 1994); *United States v. Nash*, 910 F.2d 749, 752-53 (11th Cir. 1990); *Rutledge*, 900 F.2d at 1130-31. And while police misrepresentations about the *legal* consequences of confessing are "likely to render a

4

## II. FACTUAL FINDINGS[3]

In addition to his duties as a detective with the Richmond Hill Police Department, Douglas Sahlberg worked weekends as a manager for a local hardware store. Doc. 39 (Supp'n Hearing Tr. ("Tr.")) at 25, 55. He came to know Vandiver as a regular customer and addressed him on a first-name basis. *Id.* at 40. He knew other members of his family as well, and once when Vandiver's stepfather lapsed into a diabetic coma, Sahlberg rendered aid as a first responder. *Id.* at 65-71. He also employed Vandiver's stepfather to work on his car. So, Detective ("Det.") Sahlberg had a "friendly relationship" with Vandiver and his family. *Id.* at 55 (testimony by Vandiver's wife); *id.* at 86 (where Vandiver testified that he "knew Doug on such a level that I felt like we were friends.").

---

suspect's confession involuntary," a mere "misrepresentation of *fact*" about the nature and strength of the government's evidence (such as falsely stating that the suspect's fingerprints were found at the crime scene or that he has been implicated by another) "are not enough to render a suspect's ensuing confession involuntary." *Lall*, 607 F.3d at 1285 (emphasis added).

[3] For the purpose of this Order, the Court will assume to be true both the indictment's factual allegations and the unchallenged police report facts noted herein. Some background facts have also been elicited from Vandiver's recorded (but untranscribed) confession. Gov't Ex. A (audio disk of July 24, 2013 interrogation).

It was thus with some familiarity that Sahlberg, with fellow detective Robert Linton, approached Vandiver at his Richmond Hill residence on July 19, 2013, to investigate a neighbor's complaint that someone had burned a crudely constructed cross on his front lawn, erected a plywood "Nigger's Leave" (sic) sign that contained a hangman symbol, and thrown a watermelon and some bologna at his car.[4] Doc. 20-2 at 2; doc. 20-5 at 3. Det. Linton had previously observed some wood material at Vandiver's residence that resembled the wood used to make the cross and plywood sign, and it was this plain-view evidence that prompted the detectives' interest. Tr. at 7, 8, 10, 26; doc. 20-3 at 2; doc. 20-4. On that occasion Det. Sahlberg spoke with Vandiver for less than 30 minutes. Tr. at 8-9, 27, 28. Vandiver denied any knowledge of the incident, *id.* at 27; doc. 20-3 at 2, and otherwise made no incriminating statements during that initial encounter. Tr. at 27.

Detectives Linton and Sahlberg returned to Vandiver's residence on July 24, 2013, where they found him sitting on his front porch amid family members. Tr. at 28-29; doc. 20-4 at 2. As during the July 19th

---

[4] The Court hereafter will refer to all of these acts as "the cross burning" incident.

encounter, Det. Sahlberg was "very cordial, very nice." Tr. at 72 (Vandiver's testimony). Initially, only Sahlberg spoke with Vandiver. *Id.* at 13. The two walked off to speak privately, and it was during that consensual encounter that Vandiver confessed to the cross burning. *Id.* at 30 (Vandiver initially denied knowledge, but "after a few minutes of talking he said I did it. And at that point I asked him why. He said he had gotten intoxicated, I think he said drunk, and thought it would be a practical joke."); doc. 20-4 at 2 ("Vandiver unprovoked said he was intoxicated when he burnt the cross on his neighbor[']s front yard and thought it would be funny."); *see also* tr. at 10-11. Vandiver admitted that even before the detectives came back to his residence for a second interview, he had developed a desire to tell the truth about what he had done. Tr. at 87.

Vandiver then agreed to meet the detectives at a nearby police station for a recorded interview. He drove himself to the police station. At the outset of the interview, he was informed that he was not under arrest and was free to leave. Before proceeding with the interview, Vandiver stated that he "want[ed] to offer on the record here that I'm

trusting ya'll, just like ya'll are trusting me." Gov't Ex. A. He did not indicate what he meant by that statement, nor did the detectives ask him to explain the comment. Instead, Det. Sahlberg had Vandiver read aloud a standard *Miranda* advice-of-rights form indicating that Vandiver had not been threatened or made any promises in exchange for his statement. *Id.* With very little prompting, Vandiver then furnished a detailed account of how he constructed and set afire the cross that he placed in the victim's yard, and how he later erected the sign and threw food at the victim's vehicle. *Id.*; doc. 20-3 at 3. In addition to his recorded statement, Vandiver completed and signed a written account of his actions and wrote a letter of apology to the victim. Doc. 20-5 at 1.

The fact that each encounter between the detectives and Vandiver was entirely consensual and even "cordial" is not disputed. But there is a critical dispute as to the exact nature of the unrecorded backyard conversation between Vandiver and Det. Sahlberg on July 24, 2013. According to Vandiver, when he asked at the outset of the interview what would happen "if somebody from this house owns up" to the cross burning, Sahlberg assured him that "we're not going to do anything"

8

provided he furnished the detectives with a written statement and an apology letter. Tr. at 73. The detectives then assured Vandiver that "it would be to [his] best advantage now to go ahead and take care of this . . . before CNN or the FBI get involved." *Id.* But "*if* they had to come back and make an arrest, [then] they would get me on something like trespassing, or disorderly conduct with some type of misdemeanor charge." *Id.* (emphasis added). While Vandiver conceded that Det. Sahlberg did tell him at one point that he couldn't rule out the FBI's involvement or say for certain what charges might be filed, he claims that these reservations were not expressed until *after* his recorded interview and formal statement at the police station. *Id.* at 74 (admitting that Sahlberg said "well, we're hoping that this apology letter squishes this, but I really don't know."); *id.* at 93 (admitting that Sahlberg told him "that he had limited control" over what would happen, but claiming that this statement was made only "[a]fter I gave my statement at the police station, on the steps."); *id.* at 101 (claiming that Sahlberg's statement that he could "make no promises . . . happened at the police station"); *id.* at 105 (disputing Sahlberg's testimony that he told him a number of times

at his residence that the FBI might get involved in the case).

Detective Sahlberg gave a very different account of his backyard encounter with Vandiver. He testified that not only did he never promise Vandiver that he would face only state misdemeanor charges, he specifically disabused him of that notion:

> A. I explained it several times, before that and after that, that we didn't have any idea where this could possibly [go], and because the FBI could adopt this case from us or not. I did say to him that if it stayed at a state level it could possibly be a misdemeanor charge of criminal damage to property or something along those lines. That would have to be up [to] the district attorney's office because the State of Georgia, as far as I knew at the time, did not have a hate crime. But there again, I said numerous times that we didn't know where this was going because the FBI may adopt this case.
>
> Q. Did you ever make any promises about, hey, if you do confess, though, or write a letter or statement, it'll stay at a state level.
>
> A. Absolutely not.

*Id.* at 31. Detective Sahlberg never wavered in his testimony about this point. *Id.* at 36 ("I said we had no idea where this case was going. I said that numerous times because the FBI could possibly be involved."); *id.* at 37 ("I continuously said to him, I have no idea where this is going . . . [b]ecause we didn't know."); *id.* at 45, 46.

The parties agree that the outcome of the suppression motion hinges upon the resolution of this factual dispute. For if the Court finds that Vandiver's confession was induced by a promise -- rather than a mere prediction -- that he would face only state misdemeanor charges, then he prevails. Conversely, if the detective told Vandiver that he could possibly face a state misdemeanor charge but that he could not guarantee how the case would ultimately be charged, then the motion to suppress must be denied.

After carefully considering the parties' briefs and arguments, and after reviewing the transcript of the suppression hearing and listening to Vandiver's recorded statement, the Court is persuaded that the government has met its burden of proving by a preponderance of the evidence that Vandiver was never promised that he would face only state misdemeanor charges if he confessed to the cross burning. *Lego v. Twomey*, 404 U.S. 477 (1972) (a confession's voluntariness need be established only by a preponderance of the evidence). Because his confession was not improperly induced by any form of state coercion, Vandiver has not established any basis for its suppression.

Vandiver acknowledged that he had been on friendly terms with Det. Sahlberg for many years and trusted him. Tr. at 74 (he considered anything that "Doug" said to be "written . . . in stone"). Indeed, when Det. Sahlberg first approached him at his residence on July 19, he "felt like Doug was there to help [him]." *Id.* at 85. Vandiver conceded that he does not believe that Sahlberg was trying to "frame" him. *Id.* at 84. Rather, even during the second encounter on July 24 he viewed Det. Sahlberg as "a friend in [his] corner" who was essentially trying to help him get out of a bad situation. *Id.* at 94. In essence, then, Vandiver is suggesting that his memory of what happened during the backyard conversation is simply better than Sahlberg's. The Court disagrees.

Vandiver admitted that during his first encounter with Det. Sahlberg on July 19, he lied when asked whether he knew anything about the cross burning incident. *Id.* at 82. Afterwards, his conscience began to bother him and he developed a desire to tell the truth about what he had done. *Id.* at 87, 89. So by the time Det. Sahlberg returned to the residence for a second interview on July 24, Vandiver was ready to

unburden his mind and confess to his wrongdoing.[5] While Vandiver was on pain medication at the time, *id.* at 90, he admitted that he was "not at a DUI state of mind," *id.*, was perfectly capable of driving in a safe manner, and never mentioned to the detectives that he was taking medication before driving to the police station. *Id.* at 91.

Vandiver concedes that Det. Sahlberg never told him that he would

---

[5] On cross-examination, Vandiver testified as follows:

> Q. So during that time [between the first and second interviews] you didn't necessarily have regret, but you anticipated that there would be a time in the near future where you could kind of reveal the truth.
>
> A. That would be correct.
>
> Q. And so, and part of you had, in your conscience at least, a desire to reveal the truth; correct?
>
> A. That is correct.
>
> Q. Because you kind of wanted that burden off of your shoulders; is that fair to say?
>
> A. I would agree with that.
>
> Q. You wanted to come clean, you wanted to tell the truth about what you did.
>
> A. Yes, sir.

*Id.* at 87; *id.* at 89 ("Q. [Sahlberg] didn't overbear your will to talk. You already had a desire to tell the truth; correct? A. Correct.").

*not* be prosecuted by the FBI, *id.* at 92 (though "he never said anything else to lead me to believe that this would happen"), and that rather than promising him "what's going to happen . . . [h]e told me what he thought would happen." *Id.* at 93. Of course, a confession is not improperly induced by a police officer's mere prediction of what he thinks will happen as the case progresses. Nevertheless, Vandiver insists that Det. Sahlberg gave him the impression that if he would furnish a statement and write an apology letter, then he "would not be facing felony charges or anything like that." *Id.* at 92. But during his recorded interview at the police station, immediately after he asked whether he could "trust" the detectives, Vandiver was asked to read aloud a *Miranda* waiver reflecting that he had not received any promises for his testimony.[6] *Id.* at 95. And on cross-examination, he admitted "[t]hat was true." *Id.* at 95-96; *id.* at 98 ("Q. [After Sahlberg said he did not know what would happen] "you didn't say, whoa, whoa, you told me this thing wouldn't -- you know I would get a misdemeanor. You never brought that up; did you? A. I never brought that up . . . ."). And on direct examination by his own

---

[6] During the recorded statement, neither Vandiver nor the detectives made any reference to a promise of leniency or the potential charges that might be filed. Nor was there any mention of the FBI, the NAACP, or CNN during the interview.

attorney, Vandiver acknowledged that Det. Sahlberg had never actually used the word "promise" but had simply stated his "hope" that the matter would be resolved "along the lines of a misdemeanor." *Id.* at 102. Thus, to some degree at least, Vandiver waffled on the important question of whether any promise was actually ever made by the detective.[7]

Det. Sahlberg, on the other hand, testified clearly and consistently that he explained to Vandiver "numerous times" that the FBI might take an interest in the case, *id.* at 31, 36, 37, and that while the case "could possibly be" charged as a misdemeanor, that decision was up to the prosecutor. *Id.* at 31. For this reason, Sahlberg emphasized that he

---

[7] Toward the end of his cross examination, Vandiver denied having earlier testified that Sahlberg mentioned during their backyard conversation that he didn't know where the case was going. *Id.* at 101 (insisting that it was only at the police station, after the conclusion of the interview, that Sahlberg expressed such reservations). Vandiver was mistaken, however, for earlier in his testimony he said the following:

> THE COURT: That statement that you just referred to when the detective said he hoped the apology letter would end the matter but he didn't know, where did that -- where did the detective make that statement?
>
> Witness: We were standing in the backyard, Your Honor, next --
>
> THE COURT: --This is not at the police station, this was still at your house?
>
> Witness: Yes, sir.

*Id.* at 74-75.

"didn't have any idea" how the case would ultimately be charged. *Id.* at 31; *id.* at 36 ("I said we had no idea where the case was going."); *id.* at 37. Despite a thorough cross-examination, Det. Sahlberg never equivocated on this point.

So the evidence reduces down to this: Vandiver admits that Sahlberg told him at some point that he was unable to guarantee that the case would be charged as a misdemeanor rather than a felony, or that it would remain a state rather than a federal case, but he asserts (at least during some portions of his testimony) that Sahlberg only made this statement at the police station, after the formal interview had concluded. The central dispute, therefore, is not about *whether* Det. Sahlberg made this remark, but *when* he made it.[8]

The Court finds Det. Sahlberg to be the more accurate historian,

---

[8] Vandiver elicited testimony from his wife that when she later ran into Sahlberg at her credit union, he said that he was "sorry," "that he had no idea that [the case] would blow into something like this," and that he had assumed Vandiver would get "probation." Tr. at 57. While Sahlberg admitted expressing sympathy for what Ms. Vandiver was going through, he denied saying anything about probation. *Id.* at 50. But even if Mrs. Vandiver's testimony is credited in its entirety, that does not lead the Court to reject Sahlberg's account of his conversation with Vandiver. Sahlberg obviously felt some remorse that the prosecution had developed into a "federal case," and while he may have hoped that Vandiver would only receive probation, that does not establish that he *promised* such an outcome. Indeed, Vandiver himself never testified that he was promised a probated sentence.

and it credits his testimony that he emphasized from the very outset of the backyard conversation that while he hoped the case would remain at the misdemeanor level, he couldn't say for certain how the case would ultimately be charged, particularly given the FBI's interest in the matter. That, of course, is an accurate statement of the reality of the situation, for as a local police detective investigating an unusual "hate crime" of this nature, Sahlberg had no power to control the prosecutor's charging decision or determine which jurisdiction, state or federal, would ultimately handle the prosecution. Det. Sahlberg certainly knew this, and the Court credits his testimony that he conveyed this reality to Vandiver. The notion that Sahlberg would keep this obvious truth hidden from Vandiver, even after Vandiver expressly asked what would happen to "somebody" who confessed to the crime, is simply not believable on this record.

Nor does the Court believe that Vandiver needed any inducement from Det. Sahlberg before confessing to the crime. Vandiver admitted that he was struggling with his conscience and wanted to tell the truth even before Det. Sahlberg arrived for the second interview on July 24.

Perhaps Vandiver's memory of the events is clouded by the internal turmoil of his mind on that occasion. Or perhaps his memory is clear but he is now shaping his testimony and fashioning a story that he hopes will help him out of his present troubles. Either way -- faulty memory or outright fabrication -- the Court finds that Vandiver's testimony is far less believable than Det. Sahlberg's testimony.

## III. CONCLUSION

The Court finds that Det. Sahlberg never promised Vandiver leniency or a reduced legal exposure in exchange for his confession. Instead of guaranteeing that he would face only state misdemeanor charges if he cooperated, Sahlberg simply engendered that hope in Vandiver's mind but made clear that he could not control future events and say how the case would be prosecuted, or by which jurisdiction. Such a "mere prediction" by the officer, given without any assurance of a particular outcome, did not constitute objectionable conduct resulting in an unconstitutional inducement of Vandiver's confession. 2 LaFave, Criminal Procedure § 6.2(c) at 624. Vandiver's suppression motion, doc. 20, must therefore be **DENIED**.

**SO REPORTED AND RECOMMENDED** this 3rd day of April, 2014.

/s/ M. Smith
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA